**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VICTORIA VIDT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 15-612 |
| v. | ) | |
| | ) | Judge Nora Barry Fischer |
| COUNTY OF ALLEGHENY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

## I.    Introduction

This action involves allegations by Plaintiff Victoria Vidt against her current employer, Defendant County of Allegheny.  (Docket No. 11).  In her Amended Complaint, Plaintiff alleges that Defendant wrongfully failed to promote her in its Public Defender Office ("PDO") because of her age and in retaliation for exercising her First Amendment rights.  (*Id.* at ¶¶ 14-28).  Plaintiff asserts claims against Defendant for the violation of 42 U.S.C. § 1983; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1); and the Pennsylvania Human Rights Act ("PHRA"), 43 Pa.C.S. § 955(a).  (*Id.*).  Defendant counters that it did not promote Plaintiff because another applicant, Brandon Ging ("Ging"), was the better candidate. (Docket No. 30).

Defendant filed a motion for summary judgment, along with a supporting brief and a concise statement of material facts, on May 2, 2016.  (Docket Nos. 29, 30, 31).  On June 13, 2016, Plaintiff filed an opposition brief, a response to Defendant's concise statement of material facts, her own concise statement of material facts, and an appendix.  (Docket Nos. 35, 36, 37, 38).  Defendant added a supplemental concise statement of material facts and a reply brief on July 5, 2016.  (Docket Nos. 43, 44).  Plaintiff filed a sur-reply brief on July 21, 2016.  (Docket

No. 48). With briefings complete, Defendant's motion for summary judgment is ripe for disposition. For the following reasons, Defendant's motion for summary judgment will be granted as to Plaintiff's § 1983 claim, but will be denied as to her ADEA and PHRA claims.

## II. <u>Facts</u>

Unless otherwise noted, the following pertinent facts are not contested. On July 9, 2001, Plaintiff was hired by Defendant to work in the PDO as a "Trial Defender 4," or an Assistant Public Defendant ("APD"). (Docket No. 31 at ¶ 1; Docket No. 36 at ¶ 1). Plaintiff has worked under three different Public Defenders: Susan Ruffner, Michael Machen, and, beginning in 2012, the current Public Defender, Elliot Howsie. (Docket No. 31 at ¶ 3; Docket No. 36 at ¶ 3). The PDO was composed of four divisions: juvenile, appellate, pre-trial, and trial. (Docket No. 31 at ¶ 4; Docket No. 36 at ¶ 4).

When Public Defender Howsie began his administration in 2012, he added a Training Division and created a Manager of Training position. (Docket No. 31 at ¶ 50; Docket No. 36 at ¶ 50). He also added manager positions within some of the other divisions. (Docket No. 31 at ¶ 50; Docket No. 36 at ¶ 50). Public Defender Howsie's goal was to become "a better Public Defender's Office," and he was interested in rewarding good work rather than longevity of service. (Docket No. 31 at ¶¶ 54-55; Docket No. 36 at ¶¶ 54-55).

Throughout her employment, Plaintiff remained an APD in the Appeals Division and did not apply for a promotion until 2014. (Docket No. 31 at ¶¶ 6-7, 9, 52; Docket No. 36 at ¶¶ 6-7, 9, 52). Plaintiff was never recommended for a promotion by any of her supervisors or colleagues, and she never sought to expand her knowledge base of the PDO by transferring to or participating in other divisions. (Docket No. 31 at ¶¶ 8, 10-11; Docket No. 36 at ¶¶ 8, 10-11). Effective January 1, 2014, Public Defender Howsie recommended Plaintiff, along with other

APDs, for a promotion from a Grade 4 APD to a Grade 3 APD. (Docket No. 31 at ¶¶ 15, 18; Docket No. 36 at ¶¶ 15, 18). The promotion increased Plaintiff's salary by over fifteen percent. (Docket No. 31 at ¶ 19; Docket No. 36 at ¶ 19).

On April 9, 2014, Plaintiff and a few other APDs wrote a memorandum to Public Defender Howsie. (Docket No. 31 at ¶ 233; Docket No. 36 at ¶ 233; *see also* Docket No. 31-13). The memorandum raised issues related to staffing and the workload of the APDs. (*See* Docket No. 31 at ¶¶ 259, 263, 265; Docket No. 36 at ¶¶ 259, 263, 265). After receiving the memorandum, Public Defender Howsie invited everyone in the Appellate Division to a meeting to discuss it. (Docket No. 31 at ¶¶ 268-269; Docket No. 36 at ¶¶ 268-269). At the meeting, Public Defender Howsie advised the attendees that staffing was a department-wide issue and that all employees needed to assist. (*See* Docket No. 31 at ¶ 270; Docket No. 36 at ¶ 270).

When a position to serve as the Deputy of Appeals was posted, Plaintiff and Ging applied, along with another internal applicant and several external applicants. (Docket No. 31 at ¶ 61; Docket No. 36 at ¶ 61). The job announcement required candidates to "have five (5) years of experience managing the day to day operations in a legal environment." (Docket No. 31-9 at 1). Plaintiff acknowledges that while she did not volunteer to work in other divisions that had staffing shortages and did not apply for lower level management positions, Ging had volunteered and served as a manager. (Docket No. 31 at ¶¶ 64, 69, 72; Docket No. 36 at ¶¶ 64, 69, 72). Plaintiff believed that she was the most qualified candidate for the position because of her experience, her skill as an APD, her temperament and ability to work with others, and her management experience while serving as a senior law clerk. (Docket No. 31 at ¶¶ 81, 84, 86; Docket No. 36 at ¶¶ 81, 84, 86).

The interview process consisted of two rounds, with the first round before Public Defender Howsie and Chief Deputy Shanicka Kennedy, and the second round before Public Defender Howsie, Chief Deputy Kennedy, and Deputy County Manager Steve Pilarski. (Docket No. 31 at ¶¶ 116, 119; Docket No. 36 at ¶¶ 116, 119). During her first interview, Plaintiff did not describe how she would discipline employees and instead stated that she did not believe that discipline would be an issue in the Appeals Division because her colleagues did not miss deadlines and attended court proceedings. (Docket No. 31 at ¶ 129; Docket No. 36 at ¶ 129). Plaintiff had difficulty answering questions related to discipline because she was not familiar with the PDO's discipline program. (Docket No. 31 at ¶ 130; Docket No. 36 at ¶ 130). Plaintiff has acknowledged that after her first interview, she did not seem to make the positive impression that she had wanted to make. (Docket No. 31 at ¶ 144; Docket No. 36 at ¶ 144).

During her second interview, Plaintiff was asked similar questions, and the only real difference between the two interviews was Deputy County Manager Pilarski's presence. (Docket No. 31 at ¶ 138; Docket No. 36 at ¶ 138). Plaintiff stated that she was neither "comfortable" nor "competent" to try cases. (Docket No. 31 at ¶¶ 217-218; Docket No. 36 at ¶¶ 217-218). In his handwritten notes, Deputy County Manager Pilarski expressed dismay in relation to Plaintiff's response and to her statement that she would encourage employees to assist if there were staff shortages but would not make it mandatory. (Docket No. 31 at ¶¶ 219, 221, 227; Docket No. 36 at ¶¶ 219, 221, 227). Plaintiff believed that the second interview "went okay" and that she had a "50/50" chance of getting the position. (Docket No. 31 at ¶¶ 145, 147; Docket No. 36 at ¶¶ 145, 147).

When Plaintiff interviewed for the position in May 2014, the concerns that she had raised in the April 9, 2014 memorandum had been addressed. (Docket No. 31 at ¶ 260; Docket No. 36

at ¶ 260). During the interview process, Public Defender Howsie asked Plaintiff why she wrote the memorandum and why she did not address her concerns with him first. (Docket No. 31 at ¶¶ 157, 271-272; Docket No. 36 at ¶¶ 157, 271-272). Public Defender Howsie also asked Plaintiff how she would handle receiving such a memorandum if she were the Deputy of the Appellate Division. (Docket No. 31 at ¶¶ 163, 274; Docket No. 36 at ¶¶ 163, 274). In response, Plaintiff stated that she would hire new attorneys or stop taking cases to reduce caseloads. (Docket No. 31 at ¶¶ 276-277; Docket No. 36 at ¶¶ 276-277). Plaintiff has conceded that Public Defender Howsie's questions were appropriate to ask. (Docket No. 31 at ¶¶ 273, 275; Docket No. 36 at ¶¶ 273, 275). She has also agreed that her claim of retaliation for her participation in the April 2014 memorandum is based only upon Defendant's failure to promote her. (*See* Docket No. 31 at ¶ 282; Docket No. 36 at ¶ 282).

Plaintiff's application materials totaled ten pages, while Ging's totaled ninety-eight pages. (Docket No. 31 at ¶¶ 283-284; Docket No. 36 at ¶¶ 283-284; *see also* Docket Nos. 31-17, 31-18, 31-19, 31-20). Ging included a cover letter, a list of key cases, and references; Plaintiff did not include any such documents. (Docket No. 31 at ¶¶ 285-287, 291; Docket No. 36 at ¶¶ 285-287, 291). Plaintiff has acknowledged that Ging was already supervising twenty-one APDs, kept a caseload in the Appeals Division after he was promoted as the Manager of Pretrial Services, and had an established record of knowing the goals of the office, following them, and carrying them out. (Docket No. 31 at ¶¶ 296-297, 326; Docket No. 36 at ¶¶ 296-297, 326). Plaintiff is also aware that Ging made presentations, which included a written proposal of a new training program, at his interviews. (Docket No. 31 at ¶ 298; Docket No. 36 at ¶ 298). Plaintiff has agreed that Ging's proposals to change the Appeals Division into a "Post-Conviction" Division, to remove ARD from the division, and to move probation and

parole into the division were good ideas. (Docket No. 31 at ¶¶ 301-305, 308; Docket No. 36 at ¶¶ 301-305, 308). However, Plaintiff believes that the ideas that she presented were different from those that Ging presented. (Docket No. 31 at ¶ 323; Docket No. 36 at ¶ 323). She believes that part of the reason why she did not receive the promotion is because of her age and experience, and because of her participation in the April 9, 2014 memorandum. (Docket No. 31 at ¶¶ 327-328; Docket No. 36 at ¶¶ 327-328).

## III.    <u>Standard of Review</u>

A grant of summary judgment is appropriate when the moving party establishes "'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015) (quoting FED. R. CIV. P. 56(a)). A genuine dispute of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine disputes. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine dispute, in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the Court is required to view all facts

and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Further, the benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F. 3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatory answers to demonstrate the existence of a genuine dispute. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

## IV.   Discussion

### A.   Plaintiff's 42 U.S.C. § 1983 Claim

Plaintiff claims Defendant, a county, violated 42 U.S.C. § 1983 by not promoting her to Deputy of Appeals as retaliation for asserting her First Amendment rights when she co-wrote the April 9, 2014 memorandum. Analyzing Plaintiff's 42 U.S.C. § 1983 claim requires two steps. First, Defendant's failure to promote Plaintiff must be a municipal policy for liability to attach. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) ("The Court's holding and reasoning in *Monell* have created a two-path track to municipal liability under § 1983, depending on whether the allegation is based on municipal policy or custom.").

Second, Plaintiff's memorandum must have constituted protected speech under the First Amendment and must have caused Defendant to not promote her. *Baranowski v. Waters*, No. 05-CV-1379, 2008 WL 4000406, at *17 (W.D. Pa. Aug. 25, 2008), *aff'd*, 370 F. App'x 318, 319 (3d Cir. 2010) (noting that a First Amendment retaliation claim includes two components and stating that "[t]he first component requires a showing that the speech uttered by the public employee enjoys constitutional protection from employer discipline, and the second component requires the public employee to establish causation between that speech and the relevant act of retaliation").

### 1. *Municipal Policy Analysis*

42 U.S.C. § 1983 provides a cause of action for individuals whose constitutional rights are deprived by persons "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. Municipalities are "persons" who may be sued under 42 U.S.C. § 1983. *Monell*, 436 U.S. at 690. However, a municipality "cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. Congress intended municipalities to be liable only "pursuant to official municipal policy of some nature caus[ing] a constitutional tort." *Id.*

Policies can apply to more than repeated, similar circumstances. A municipality may be liable for a "single decision by municipal policymakers under appropriate circumstances." *Pembaur of City of Cincinnati*, 475 U.S. 469, 480 (1986). Liability "attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481; *McGreevy v. Stroup*, 413 F.3d 359, 367-68 (3d Cir. 2005) ("[A]n official with policymaking authority can create official policy, even by rendering a single decision."). Thus, liability under 42 U.S.C. § 1983 requires "a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing

final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483. When fault and causation of a plaintiff's injury by a municipality is obvious, "proof that the municipality's decision was unconstitutional would suffice to establish that the municipality itself was liable for the plaintiff's constitutional injury." *Bd. of Cnty. Comm'rs. of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 406 (1997).

Employment decisions by municipalities can result in liability under 42 U.S.C. § 1983. A final policymaker's deliberate decision to terminate a plaintiff "qualifies as policy for the purpose of determining *Monell* liability." *Ditzler v. Hous. Auth. of City of Nanticoke*, No. 3:14-CV-70, -- F. Supp. 3d --, 2016 WL 1089154, at *4 (M.D. Pa. Mar. 21, 2016). Further, a non-discriminating final decisionmaker may not legitimize an otherwise discriminatory employment decision. *See Azzaro v. Cnty. of Allegheny*, 110 F.3d 968, 974 (3d Cir. 1997) (en banc) (holding that an employment decision tainted by discriminatory lower-level decisionmakers may taint the decision made by a non-discriminating-final decisionmaker).

The material facts asserted establish that the decision not to promote Plaintiff constitutes municipal policy. This conclusion stands regardless of whether Defendant's final decisionmaker knowingly retaliated against Plaintiff for her speech, or just "rubber stamped" an unlawful decision made by lower-level employees. *McGreevy*, 413 F.3d at 368; *Azzaro*, 110 F.3d at 974. After the second round of interviews, County Manager William McKain had final decision-making authority over selecting the Deputy of Appeals. (Docket No. 31 ¶ 121; Docket No. 36 ¶ 121). If McKain unlawfully denied Plaintiff a promotion based upon her speech, then Defendant could be liable under 42 U.S.C. § 1983. Similarly, if the interviewers recommended Ging in retaliation for Plaintiff having written the April 9, 2014 memorandum and McKain "rubber stamped" the interviewers' choice, his decision constitutes municipal action — even if McKain

himself had no personal retaliatory animus toward Plaintiff. *Azzaro*, 110 F.3d at 974. Therefore, McKain's decision to promote Ging rather than Plaintiff qualifies as municipal policy for the purpose of determining whether Defendant is liable under 42 U.S.C. § 1983.

2. *First Amendment Retaliation Analysis*

Having concluded that Defendant's decision to promote Ging qualifies as municipal policy, the Court must now turn to Plaintiff's claim that Defendant did not promote her as retaliation for asserting her First Amendment rights when she co-wrote the April 9, 2014 memorandum. A First Amendment retaliation claim of this kind can be broken down into two general components which include a total of five specific questions. *Baranowski*, 2008 WL 4000406, at *17. The first component requires a showing that the speech uttered by the public employee is constitutionally protected from employer discipline, and the second component requires the public employee to establish causation between that speech and the relevant act of retaliation. *Id.* The question of constitutional protection involves a three-part inquiry that includes questions of law for the Court. *Id.* at *17-19 (finding that the question of constitutional protection is a question of law). To be constitutionally protected, speech must be made by a public employee: (1) in his or her capacity as a citizen; (2) addressing a matter of public concern; and (3) under circumstances in which, on balance, the public employee's interest in speaking outweighs his or her employer's interest in workplace efficiency. *Id.* at *17 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

Where the speech at issue satisfies the test for constitutional protection, the inquiry turns to the second component — the issue of causation. *Id.* To establish causation, a public employee must demonstrate that his or her speech was a substantial or motivating factor behind the challenged act of retaliation. *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,

429 U.S. 274, 287 (1977)). If such a showing is made, then the burden shifts to the defendant to establish by a preponderance of the evidence that it would have taken the same action even in the absence of the employee's constitutionally protected speech. *Id.*

In applying the first component of the test, the Court must determine whether Plaintiff spoke as a citizen or as a government employee. Supreme Court jurisprudence contrasts these two speech categories. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Neither the location in which the speech is made, nor whether the speech relates to the public servant's employment, is dispositive. *Id.* at 420-21. The *Garcetti* decision did not provide a framework defining when a public employee speaks as a private citizen or pursuant to his or her official duties. *Id.* at 424. Instead, the Court mused that the "proper inquiry is a practical one." *Id.*

Eight years after the Supreme Court decided *Garcetti*, it held that "[t]he critical question under *Garcetti* is whether the speech at issue is itself *ordinarily* within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, -- U.S. --, 134 S. Ct. 2369, 2379 (2014) (emphasis added). Ordinary duties are "part of the work [the employee] was paid to perform on an ordinary basis." *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 180 (3d Cir. 2015) (citing *Lane*, 134 S.Ct. at 2378-79). The United States Court of Appeals for the Third Circuit has acknowledged that adding the word "ordinary" to the scope of a public employee's job duties, as *Lane* did, "may broaden *Garcetti's* holding." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 990 (3d Cir. 2014). While the Third Circuit has not held that *Lane* broadened *Garcetti's* holding, it chose to apply *Lane*'s test for private-citizen speech in *Flora*

because "*Lane* now controls." *Flora*, 776 F.3d at 179 (citing *Perez v. Dana Corp., Parish Frame Div.*, 719 F.2d 581, 584 (3d Cir. 1983) ("As a general rule an appellate court must apply the law in effect at the time it renders its decision.")). This Court will follow the *Flora* court's lead.

Comparing two First Amendment retaliation cases involving county-employed attorneys with this case's facts reveals that Plaintiff's memorandum to Public Defender Howsie is not protected by the First Amendment. In *Garcetti*, the Supreme Court held that a deputy district attorney who was reassigned to a new position, transferred to another courthouse, and denied a promotion after he wrote a memorandum recommending the dismissal of a case, did not speak as a private citizen. *Garcetti*, 547 U.S. at 413-15, 421-22. The Court reasoned that the deputy district attorney "spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." *Id.* at 421. The memorandum at issue "was written pursuant to [his] official duties." *Id.* Further, the Court stated that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id.* at 421-22. Consider *Garcetti* at the government-employee speech side of a spectrum, with private-citizen speech on the opposite end.

*Flora* sits squarely on the private-citizen end of the speech spectrum. In *Flora*, the former Luzerne County chief public defender alleged the county infringed his First Amendment rights through wrongful termination. *Flora*, 776 F.3d at 173. He claimed Luzerne County retaliated against him for suing it to secure adequate funding for the public defender's office and for exposing the county's failure to comply with a Pennsylvania Supreme Court expungement order. *Id.* The Third Circuit held that Flora's efforts were not part of his ordinary job responsibilities. *Id.* at 179. "Flora's ordinary job duties did not include the public reporting of

lingering effects from government corruption or the filing of a class action suit to compel adequate funding for his office." *Id.* at 180. He was not paid to expose government corruption or to sue his own employer. *See id.* While Flora certainly benefitted his indigent clients by suing Luzerne County to provide additional cash for the public defender's office, "that does not bring the speech within the realm of his ordinary job duties." *Id.*

In the instant case, the memorandum that Plaintiff co-wrote is government-employee speech that the First Amendment does not protect. It addressed a perceived shortage of Appellate Division attorneys that may impair the division's ability to provide adequate legal services, a problem that could violate the Rules of Professional Conduct and Defendant's Practice Standards. (Docket No. 31 at ¶¶ 233, 259, 263, 265; Docket No. 36 at ¶¶ 233, 259, 263, 265; *see also* Docket No. 31-13 at 1-2). After stating that defendants in Pennsylvania have a right to appeal and a right to effective assistance of counsel, the writers of the memorandum requested that the Deputy of Appeals position be immediately advertised and filled, and that the remaining vacant APD positions be promptly filled. (Docket No. 31-13 at 2).

Plaintiff argues that the memorandum, and the topics discussed within it, fall outside her ordinary job duties. Specifically, Plaintiff contends that while she has a job duty to raise ethical concerns to her supervisor, this obligation did not extend beyond her immediate supervisor. (Docket No. 35 at 21). In support of her argument, Plaintiff cites to Defendant's Practice Standards, which provide that APDs must "promptly advise" a supervisor if an APD "concludes that the workload precludes the provision of adequate legal representation." (*Id.* (citing Docket No. 38-2 at 40)). Pointing out that the memorandum was addressed not only to her immediate Appellate Division supervisor at the time, Carrie Allman, but also to Public Defender Howsie and to Chief Deputy Kennedy, Plaintiff argues that "raising such concerns was not an ordinary

duty." (*Id.*).  Plaintiff further asserts that she "had no duties at all with respect to hiring and staffing the . . . Public Defender's office." (*Id.*).

The Court must reject Plaintiff's arguments.  Plaintiff suggested through the memorandum that the PDO add Appellate Division attorneys to ameliorate potential violations of the Rules of Professional Conduct, the PDO's Practice Standards, and constitutional requirements due to high APD workloads.  (Docket No. 31-13 at 1-2).  Plaintiff now admits that her job duties included ensuring that her workload did not preclude her from following her ethical duties, the PDO's Practice Standards, and her formal job description.  (*See* Docket No. 31 at ¶¶ 242-244; Docket No. 36 at ¶¶ 242-244; *see also* Docket No. 38-2 at 40).  Thus, the memorandum's suggestions, which center on providing adequate legal representation to indigent clients, fall squarely within Plaintiff's ordinary duties as an APD.

Plaintiff's case is far more similar to *Garcetti* than it is to *Flora*.  In both this case and *Garcetti*, the plaintiff-attorneys raised concerns to their supervisors regarding their ordinary duties.  In *Garcetti*, the duty at issue was "advis[ing] his supervisor about how best to proceed with a pending case."  *Garcetti*, 547 U.S. at 421.  For Plaintiff, it was advising her supervisors about the legal-ethics issues posed by heavy APD workloads.  (Docket No. 37 at ¶¶ 41-42 (Plaintiff stating that "she was required to abide by all applicable codes of ethics and professional responsibility and seek guidance on ethical issues" and that "[u]nder Defendant's Practice Standards[,] an attorney who concludes that the work load precludes the provision of legal representation shall immediately [inform] the attorney's supervisor")).  Plaintiff and the deputy district attorney in *Garcetti* were both paid to perform the duties that allegedly caused their adverse-employment experiences.  In contrast, the chief public defender in *Flora*:  (1) sued his own employer, Luzerne County, so that his office would receive more funding; and, (2)

exposed the county's failure to comply with an expungement order. *Flora*, 776 F.3d at 172-74. Luzerne County did not pay Flora to sue it or expose its failures. *Id.* at 180. Here, Defendant pays Plaintiff "to abide by all applicable codes of ethics and professional responsibility and seek guidance on ethical issues" and to notify her supervisor when "the work load precludes the provision of legal representation." (Docket No. 38-2 at 40). Therefore, Plaintiff acted within her ordinary duties by writing a memorandum regarding the ethical implications of the increased workloads that the APDs were handling.

The Court similarly concludes that Plaintiff's memorandum is not protected speech under the First Amendment simply because she reported legal-ethics issues "up the chain of command." (Docket No. 35 at 21). The Third Circuit considers speech directed "up the chain of command" to be a "'contour[] to *Garcetti*'s practical inquiry'" regarding whether employee speech comports with official job duties. *Flora*, 776 F.3d at 177 (quoting *Dougherty*, 772 F.3d at 988); *see also Foraker v. Chaffinch*, 501 F.3d 231, 241-43 (3d Cir. 2007), *abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011). In *Foraker*, the Third Circuit held that police officers' mandatory reports to superiors regarding hazards at a firing range were within their official duties. *Foraker*, 501 F.3d at 241-43. Plaintiff had a similar obligation to the PDO: to "promptly advise . . . [her] supervisor" if she "concludes that . . . [her] workload precludes the provision of adequate legal representation." (Docket No. 38-2 at 40). Plaintiff notified her supervisors through the memorandum about legal-ethics issues regarding her workload. (Docket No. 31-13 at 1-2). Therefore, under *Foraker*, Plaintiff spoke "up the chain of command" and thus acted within her official job duties. Because Plaintiff's memorandum does not constitute protected speech under the First Amendment, Defendant's

motion for summary judgment regarding her 42 U.S.C. § 1983 claim for First Amendment retaliation must be granted.

**B.  Plaintiff's ADEA and PHRA Claims**

Plaintiff also claims that Defendant promoted Ging to Deputy of Appeals instead of her due to age discrimination.  The ADEA prohibits employers from discriminating "against any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1).  The PHRA includes a similar provision and is, therefore, "interpreted coextensively" with ADEA claims under Third Circuit precedent.  *Burton v. Teleflex*, 707 F.3d 417, 432 (3d Cir. 2013); *see also* 43 Pa.C.S. § 955(a) ("It shall be an unlawful discriminatory practice . . . [f]or any employer because of the . . . age . . . of any individual . . . to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual . . . or to otherwise discriminate against such individual.").  Claims of age discrimination proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  *Snik v. Verizon Wireless*, 160 F. App'x 191, 193 (3d Cir. 2005); *see also Fakete v. Aetna, Inc.*, 308 F.3d 335, 337-38 (3d Cir. 2002) ("An ADEA plaintiff can meet [her] burden by (1) presenting direct evidence of discrimination . . . or (2) presenting indirect evidence of discrimination that satisfies the familiar three-step framework of *McDonnell Douglas*.").

The *McDonnell Douglas* framework contains three steps.  A plaintiff must first establish a prima facie case of age discrimination.  To do this, a plaintiff must show that:  "(1) she is forty years of age or older; (2) the defendant took an adverse employment action against her; (3) she was qualified for the position in question; and (4) she was ultimately replaced by another employee who was sufficiently younger."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).  If a plaintiff raises a prima facie case, the burden of production shifts to the defendant,

who must posit a legitimate-non-discriminatory reason ("LNDR") for the adverse-employment decision. *Id.* A defendant satisfies this light burden by "provid[ing] evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Id.* After a defendant provides an LNDR, the burden of production shifts back to the plaintiff "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Id.* A plaintiff must "make this showing of pretext to defeat a motion for summary judgment." *Id.*

Showing pretext is extensively discussed in the summary-judgment context. To show pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). If the plaintiff presents evidence regarding the credibility of an employer's proffered LNDR, the evidence "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 765 (internal quotation marks omitted). Stated another way, to show pretext, plaintiffs must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005). "[I]f a plaintiff has come forward with sufficient evidence to allow a finder of fact to discredit the employer's proffered justification, she need not present additional evidence of discrimination beyond her prima facie case to survive summary judgment." *Burton*, 707 F.3d at 427. This is so "because the factfinder may infer from the combination of the prima facie case, and its own rejection of the employer's

proffered reason, that the employer engaged in the adverse employment action for an invidious reason." *Id.* Plaintiffs are, therefore, "not required to produce direct evidence of discriminatory intent to demonstrate pretext and survive a motion for summary judgment." *Id.*

### 1. *Plaintiff's Prima Facie Case*

Plaintiff has established her prima facie case of age discrimination without opposition. She was fifty-one years old when she interviewed for and was not promoted to Deputy of Appeals. (Docket No. 37 at ¶¶ 1, 99; *see also* Docket No. 38-1 at 1; Docket No. 38-5 at 3-5). By not being promoted, Plaintiff suffered an adverse employment action. (*See* Docket No. 31 at ¶ 355; Docket No. 36 at ¶ 355). *See also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (explaining that an adverse employment action "constitutes a significant change in employment status, such as . . . failing to promote"). The fact that Plaintiff received a first and second interview for the Deputy of Appeals position indicates that Defendant considered her to be qualified. (*See* Docket No. 31 at ¶ 140, 148; Docket No. 37 at ¶¶ 79-82). However, Defendant promoted Ging, who is approximately sixteen years younger than Plaintiff, to Deputy of Appeals. (*See* Docket No. 31 at ¶ 355; Docket No. 36 at ¶ 355; Docket No. 37 at ¶¶ 1, 83; Docket No. 38-1 at 1; Docket No. 38-2 at 46). The Third Circuit has ruled that age differences of eight and sixteen years meet the "sufficiently younger" standard for the fourth factor of the *McDonnell Douglas* framework. *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 236 (3d Cir. 1999). Thus, Plaintiff has established a prima facie case of age discrimination.

### 2. *Defendant's LNDR for Promoting Ging Instead of Plaintiff*

Defendant has satisfied its burden to articulate a LNDR for promoting Ging to Deputy of Appeals instead of Plaintiff. The Third Circuit has recognized that "poor interview performance is a legitimate non-discriminatory reason for refusal to hire." *Thompson v. Bridgeton Bd. of Educ.*, 613 F. App'x 105, 108 (3d Cir. 2015); *see also Snooks v. Duquesne Light Co.*, 314 F.

App'x 499, 505 (3d Cir. 2009) (noting that the defendant's "proffered non-discriminatory reason for hiring [the candidate] is that she performed better in the second interview"); *Green v. Potter*, No. 08-CV-597, 2010 WL 2557218, at *5 (D.N.J. June 23, 2010) ("Poor performance in an interview is recognized as a legitimate nondiscriminatory reason for failure to hire or promote."). Likewise, the Third Circuit has concluded that an employment decision based upon application materials is a legitimate non-discriminatory reason for the refusal to hire. *See Sarmiento v. Montclair State Univ.*, 285 F. App'x 905, 909 (3d Cir. 2008) (finding that the defendant articulated a legitimate reason for its hiring decision by stating that the plaintiff was not selected "because his application materials indicated that his research and skills were not well suited to the interests of the department and the needs of the students."). Here, Defendant states that it promoted Ging rather than Plaintiff because of her performance during the interview process and because of her application materials, which Plaintiff does not meaningfully contest. (*See* Docket No. 30 at 10-14; Docket No. 35 at 7-8). Thus, considering the evidence of record, Defendant has met its burden under *McDonnell Douglas* to proffer legitimate, non-discriminatory reasons for its decision to promote Ging.

### 3. Whether Defendant's LNDR is Pretext for Age Discrimination

In applying the final factor of the *McDonnell Douglas* burden-shifting inquiry, the Court must determine whether Defendant's LNDR for promoting Ging over Plaintiff is pretext for age discrimination. A plaintiff can establish pretext by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d

at 764. After reviewing the record in its entirety, the Court finds that a reasonable jury could conclude that Defendant's LNDR is pretext for age discrimination.

First, a factfinder could infer pretext because Plaintiff was objectively more qualified than Ging. Specifically, the Deputy of Appeals job announcement stated that candidates must "have five (5) years of experience managing the day to day operations in a legal environment." (*Id.*; Docket No. 31-9 at 1). The Supreme Court has acknowledged that "qualifications evidence may suffice, at least in some circumstances, to show pretext." *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006). Viewing Defendant's job announcement in the light most favorable to Plaintiff, the Court finds that Defendant's decision to promote Ging over her could indicate pretext. Ging worked as Pre-Trial Division Manager for fourteen months, (Docket No. 37 at ¶ 84; Docket No. 38-3 at 5, 9), while Plaintiff worked as a Superior Court law clerk with supervisory responsibilities for five years, (Docket No. 38-1 at 5, 24). Thus, a reasonable jury could conclude that Plaintiff satisfied the job requirements included in Defendant's job announcement for the Deputy of Appeals position, while Ging did not.

Second, Defendant's reliance on the Second Class County Code as a way to avoid following its own minimum qualifications in the job announcement may be considered pretext by a reasonable jury. Defendant claims that the Deputy of Appeals position is exempt from merit hiring because it is a "Deputy" position, allowing Defendant to choose its preferred candidate notwithstanding its stated job requirements. (Docket No. 43 at 8-9; Docket No. 44-5 (displaying Second Class County Code § 5-1003.03)). Plaintiff argues that Defendant is trying to "distance" itself from its own job announcement to promote Ging over her. (Docket No. 35 at 11). An employer's post hoc fabrication may be evidence of pretext. *See Marconi v. Moon Area Sch. Dist.*, 104 F. Supp. 3d 686, 702 (W.D. Pa. 2015) (citing *Fuentes*, 32 F.3d at 764). Chief

Deputy Kennedy admitted in her deposition that Deputy of Appeals candidates did not need to satisfy the job requirements because they were included only "as a weeding-out process." (Docket No. 38-2 at 24). The applicants were not informed that the minimum requirements were a facade. (*See id.*). Therefore, a reasonable jury could conclude that Defendant's post hoc explanation for discarding its minimum qualifications to promote Ging shows pretext.

Third, Howsie's bolstering of Ging's trial experience could be considered pretext because Ging, at the time he was deposed, had not tried a case to verdict. One reason Defendant believes Plaintiff is less qualified than Ging for Deputy of Appeals is that Plaintiff stated she was not "comfortable" or "competent" at trying a case, while Ging answered that he would "do whatever." (Docket No. 31 at ¶ 217; Docket No. 36 at ¶ 217, Docket No. 44 at ¶ 362). The Deputy of Appeals is not required to try cases. (Docket No. 38-2 at 13). More problematic for Defendant is that Public Defender Howsie claimed Ging tried "countless" cases. (*Id.* at 13-14). However, Ging testified that he has never tried a case to verdict. (Docket No. 38-2 at 16). Defendant counters this contradiction by claiming, "Ging has done trials. He has handled a number of trial-related cases that resolved themselves through guilty pleas. He has not yet done any bench trials." (Docket No. 44 at ¶ 367). The parties may have different impressions of what constitutes a trial. Be that as it may, a reasonable jury could still infer that Public Defender Howsie was inaccurately bolstering Ging's "trial" record by claiming that Ging tried many cases, when in actuality he never tried a single case to verdict. Therefore, inflating Ging's trial experience to justify hiring him over Plaintiff could be considered pretext.

Fourth, a reasonable jury could find pretext in Defendant's claim that Plaintiff received a second-round interview as a courtesy when she was one of two finalists for Deputy of Appeals. Ten individuals applied to be Deputy of Appeals, including Plaintiff and Ging, and all candidates

were given a first-round interview. (Docket No. 31 at ¶¶ 61, 117; Docket No. 36 at ¶¶ 61, 117; Docket No. 37 at ¶ 73). Public Defender Howsie and Chief Deputy Kennedy claim Plaintiff had a poor first-round interview and received a second-round interview as a courtesy. (Docket No. 31 at ¶¶ 140-142; Docket No. 38-2 at 9-11). Plaintiff later admitted that "she did not seem to be making the positive impression that she had wanted to make" in her first interview. (Docket No. 31 at ¶ 144; Docket No. 36 at ¶ 144). However, Public Defender Howsie and Chief Deputy Kennedy still chose Plaintiff for a second-round interview over eight other applicants. (Docket No. 31 at ¶¶ 140-142; Docket No. 38-2 at 9-11). Therefore, diminishing Plaintiff's interview performance by claiming that she received a second interview as a courtesy could be pretext for age discrimination, since Public Defender Howsie and Chief Deputy Kennedy considered Plaintiff their second-best candidate for Deputy of Appeals.

Plaintiff has established several bases upon which a reasonable jury could find that Defendant's LNDR is pretext for age discrimination. *See Fuentes*, 32 F.3d at 764. Accordingly, because Plaintiff has "come forward with sufficient evidence to allow a finder of fact to discredit the employer's proffered justification," *Burton*, 707 F.3d at 427, the Court must deny Defendant's motion for summary judgment as to Plaintiff's ADEA and PHRA claims.

## V.     Conclusion

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 29) will be granted as to Plaintiff's § 1983 claim but will be denied as to her ADEA and PHRA claims.


Dated:  October 19, 2016                                    *s/Nora Barry Fischer*
                                                            Nora Barry Fischer
                                                            United States District Judge


cc:     All Counsel of Record